United States Court of Appeals for the 11th Circuit. Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. This is Judge Wilson in Tampa. Judge Lagoa is in Miami. Good morning, Your Honor. Good morning. Judge Brasher is in Birmingham and we have four appeals that are scheduled for oral argument this morning. I would advise counsel that we have read the briefs and we've examined the relevant parts of the record if that will assist you in narrowing the focus of your arguments for the time that you have available this morning. Ms. Tisa is the courtroom deputy and she will serve as the timekeeper and she will let you know when your time to argue has expired and she will also provide you a two-minute warning before your time to argue has expired. And so it looks like we're ready to proceed with the first case. It is the United States of America v. Segarro, Sligrod, Tomping, Wheeler, and Long. I see Mr. Klug is here for Topping. Mr. Sakin is here for Segarro. Mr. Solomon is here for Long. Mr. White is here for Wheeler and Ms. Shapiro is here for Sligrod. And Mr. Klug, are you ready to proceed with your argument? Thank you, Your Honor. Good morning. Richard Klug for Charles Topping at counsel table with me is Jacqueline Shapiro for Charles Sligrod. The part of the evidence against each of them is that they used their last names. They went by first name and middle name, Charles Ken and Charles David. One reason for that is, for example, Mr. Sligrod's name is, I don't know anyone who gets that name right the first time. And so they were innocent and other reasons for why they used their first and middle names. My name, for example, is Richard Carroll. All my life, my grandmother called me Richard Carroll instead of Richard Klug. She used to like to use my middle name. So that is the type of evidence, however, that was repeatedly focused on because there was essentially nothing as to Sligrod and what there was as to Topping was not consistent with the court fraud scheme that was alleged in the indictment. And that's what the district judge tried to do throughout the case was try to keep the government on track with what the indictment was, what the fraud scheme was. And that was a scheme to sell, purportedly sell, Sanimatic inferred thermometer company and made an actual product that was potentially very viable and other and later a game app that was also viable. But what the actual fraud was, the actual fraud in the company, Coulahan, Sizer, Mesa, these people, they would say, tell the salesman, you're selling Sanimatic stock. What they were actually doing is selling the owner's stock. So the owners were siphoning the money out and they bled the company out. And that was the main fraud. And the district court kept trying to keep the government focused on that fraud. And that's why she allowed a specific theory of defense instruction on it. But before I get to that multiple counts of conviction, particularly everything having to do with a California room, which is a tremendous additional amount of fraud loss that comes into play. The district court also, the government also admits in addition to those counts of conviction being, they don't even try to sustain them at all, three counts. The government also admits the district court failed in the requirement to make individualized findings of fraud loss regarding the topic. It was given essentially the same fraud loss as the owners of the company who had this vast nationwide operation going for a long period of time. No findings as to the time of Mr. Topping's knowledge, no finding as to what he actually participated in. The government, again, conceding that comes up with a new theory that at best should be considered at resentencing, if the court wants to give the government a second bite at the apple on that. Another reason for resentencing, and I don't think the court needs to get there, is this role enhancement. The role that Mr. Topping occupied was as a really good salesman. He was not an owner. He did not get anything more than his commission. It's very telling. The government claims in arguing about the fraud loss that they say, he never got more than 10% commission. That's not true, of course. He did sometimes get more than that, and that's why their alternative theory on fraud loss is wrong. But the very fact that they're saying he's a 10% commission guy who never is able to move his commission up shows that he cannot possibly be. He didn't supervise anyone. He wasn't anybody's boss. There was testimony over and over and over again. They say, oh, well, when he wasn't in the room for a while, people would turn to him and say, well, you're the senior person. That's not a leadership position. He didn't tell anybody what to do. There was never any testimony that as a result of that, he directed action. I thought that there was some testimony that Mr. Topping was sort of an assistant manager, as it were, and when someone was not there, the person leading the bowling room was not there, that he was sort of the guy who answered questions and advised other salesmen what to do. Am I wrong about that? They had been there longer. Somebody asked them a question. CAMPA is the case that I think is most close on point in saying that that does not qualify for a role enhancement. In CAMPA, Judge William Pryor, writing for the court, dealt with a case where a Cuban spy was left when all the other spies went back to Cuba. He was the only one there. If anybody had a question about what's going on, where's everybody, he would be the one for like a month, and we're talking about a couple of hours. We're talking about a guy who's left, you know, an employee who's, the owner leaves the store to go to lunch, and the employees, the senior employee at the store, when the guy comes back from lunch, no power has been transferred, no power, no hiring, nothing that the guidelines are concerned with. I think CAMPA really controls that issue. Martina's case is also... I'm sorry, counsel, your argument time is up. You're in the red. All right, thank you, Mr. Kluge. We'll now hear from Mr. Sagan on behalf of Appellant Segaro. Yes, good morning. My name is Scott Sagan. I'm here on behalf of Appellant Anita Segaro. Ms. Segaro was convicted in counts one, two, and ten of the indictment. Count one, the conspiracy count. Each of these counts was flawed by government misconduct, primarily in the closing argument where the government argued that the special jury instruction, the defense jury instruction was not the law. What if I agree with the government that the instruction was an erroneous instruction that should not have been given? Does that matter? Yes, it does matter because we relied and prepare our defense and also is to prepare our closing arguments. Often, parties may not agree with what a judge does, but that doesn't give the party a right to trash the judge's instruction and tell the jury that it does not count and that it's not the law, which is what the government did in this case. And that would go as to all three counts that Ms. Segaro is which were the alleged sales, which was the alleged sales to two people. There's no evidence to support that Ms. Segaro was involved at all in those sales in count two and ten. She didn't personally participate in count two, the November 11th transaction where actually the owner of the company, Sizer, sold stock to to the government's closing argument. Let's assume that the prosecutor's arguments were improper. What's your best argument that the remarks were detrimental to the defendant's substantial rights, which is what our cases say you have to demonstrate in order to support a reversal of the conviction? Yes, sir. The government's proof did not establish that Anita not only participated in the scheme to defraud. There was no proof at all that Anita Segaro was aware that Sizer and Mesa were stealing money or the Santa Medix information provided was not true. She may have lied to sell stock. However, she didn't know there was a fraud going on or that the owners of the company were the people who were actually stealing the money and not putting it back into the business. The jury could very easily have determined that the defendant, like the investors, believed the stock had value and that they all had been duped by Mesa and Sizer. I guess my question is if there's enough evidence, let's say if there's enough evidence to convict her and the prosecutor's comments during closing argument were improper, how do you show that the error in permitting the testimony by the or the closing argument by the prosecutors affected your client's substantial rights? There's a completely undercut our defense in the case. There was ample evidence that my client had told lies in selling the stock. I admit that and that came out, but there was no evidence that she knew that this was a fraud being conducted by the owners of the company in Miami when she was in California. So, not evidence that she ever had the intent to defraud. That was the whole focus of the defense theory here in this case. That was the theory throughout the trial, throughout the closings, throughout the opening, and everything that we did in this case. It was done in rebuttal. We had no opportunity to get back up and correct the government because it was done in rebuttal, Your Honor. All right. I think we have your argument, Mr. Sagan, and you reserved some time for rebuttal. Thank you. Yes, sir. Let's hear from Mr. Solomon on behalf of Long. Good morning. May it please the court. I'm Harry Solomon on behalf of the Apple League Cross Appellate, James W. Long. I'd like to start, Judge Wilson, by addressing a question that you, I only have 60 seconds on this initial shot, so I'd like to start with my first question, which is, why do you think the government's comments were harmless error? In my client's case, it's pretty hard to say that they were harmless error when Judge Cook acquitted my client. So, you can't just say that, well, it's harmless error because the evidence of your client's participation in this is overwhelming. It was not overwhelming. The judge reserved ruling on a Rule 29 motion for judgment of acquittal at the close of all evidence and granted it post-verdict. You know, this is, it's unfortunate. This is a, I see I'm almost out of time already, but this is a situation where the government just said, you know what, we don't like your instruction, so we're going to ignore it and we're going to tell the jury to ignore it. And if, I must say, I've been a lawyer now probably close to 45 years. If I would ever not do something you told me, Judge Wilson, or Judge Brasher, you told me, you'd be pretty angry at me. And this is what the prosecutor did. He trashed the instruction because he didn't like it, rather than accepting it and responding to it. Now, that instruction was a given instruction. Well, of course, didn't Judge Cook give the jury a curative instruction? She did not. What she did, in fact, Judge Cook lamented the weakness of her own curative instruction. What she did was, she simply reiterated the standard jury instruction about following all the instructions. But the prosecutor said that wasn't curative? Not sufficiently curative, in my opinion, and she even said that. Can I even say that? Can I ask a quick question, Judge Wilson? Yes. So, you know, you say that the prosecutor sort of trashed the instruction. And I read the closing argument and I read the instruction and I also read the debate about whether this instruction should be given. And it was not a given instruction. Judge Cook gave an improper instruction because the district court is couching all of this legal terminology in an instruction that says defendants contend. So, it says defendants contend there is a difference between deceiving and defrauding. And then it goes on to define various legal terms. And that's not the instruction that the defense initially wanted. The defense wanted an instruction that went, you know, that modified the pattern jury instructions on the elements and that included this in the elements. But what the defense got was this weird sort of contention instruction that meshed contentions with legal elements. And so, when I read the prosecutor's argument, I see not a prosecutor who is trashing the instruction, but a prosecutor who is trying to explain this instruction that, in my view, at first blush, doesn't make much sense. What do you think about that reading of the transcript? Well, number one, the instruction was a correct statement of law, just like... But would it be correct to say, for example, defendants contend? I mean, it seems like that's odd to say if you're defining legal terms, that seems improper. Well, I mean, it's still a theory of defense instruction, but she gave the instruction. How do you deal with the fact that this jury heard the instruction? This isn't a question of there was a failure to give an instruction. This jury heard it. So, obviously, what they did with this case was factored in what this prosecutor told them to do. So, you can't just back away from the fact that this actually happened in this case. This isn't a failure to give an instruction. This was an instruction that just jury heard. And how do you deal with that? I mean, we didn't have any bite at the apple afterwards. That was rebuttal close. It's actually kind of sad that the prosecutor waited to this part of a two and a half month trial to do what he did. You know, defense lawyers, when we get where we're told to do something by a judge, we do it. We might not always like it, but we do it. And Judge Cook said we did it, but he didn't. He was angry about that instruction. And so he told the jury that it wasn't the law and they could disregard it. And it was an instruction that was given to the jury. One of the instruction the district court had given was defendants contend that they are innocent of all charges and not guilty. Could the prosecutor stand up and say, look, look at this instruction. It's about what they contend, but it's not the law. He had a right. I'm sorry. I didn't mean to interrupt. Go ahead. He had he had a right to stand up and say, this is why this instruction does not apply to the facts of this case. But he didn't have a right to stand up and say, this isn't the law. You can disregard it. Forget about what Judge Cook told you. You can disregard it. That is completely improper under any circumstances. You wouldn't let us do this. And you'd be pretty angry if somebody did it over your instructions. So this is something that actually happened. It's something that we actually had to deal with at trial. If if if it was an issue of a failure to give an instruction, then I certainly think that you might pose the questions that you're posing. But this was given and we we were stuck with what happened. How do we know what the jury didn't say on the Red Council? OK, I guess I'll leave it at that, then we have your argument, Mr. Solomon. If you reserve some time for a vote, I reserve two minutes on my appellee part. OK. All right. We'll hear from you again. Let's hear from Mr. White on behalf of in this jury in this closing argument issue. I think that the problem here is that the government was taking the position throughout that any misrepresentation at all by any of the salespeople was went to the nature of the bargain and was therefore evidence of the defendant's guilt in terms of joining this conspiracy to defraud. The instruction that was given that there was a such thing as an intent to deceive that was not did not go to the nature of the bargain and was something that that that the court had the jury had defined was would not necessarily be that that's that a scheme to defraud. That is a true statement of the law. Now, we contended that the evidence fit that description. And as Mr. Solomon said, the government had every right to say, no, the evidence does not fit that description, but they did not have the right to say that's not the law because it is the law. And even the cases that they that they presented, the Walker case, I believe it was that they just submitted last week as supplemental authority supports the theory that that law that there is a difference between intent to deceive and an intent to defraud. And the government has to prove an intent to defraud in order to find guilt. All right. Thank you, Mr. White. And Mr. Shapiro, you are not making an argument. Is that correct? Yeah, I'm available to answer questions. I was deferring to Mr. Kluge to address Mr. Smigrod's argument. But if the court would like to hear from me, I'd be happy to speak further about Mr. Smigrod. So you're ceding your time. If that's the case, I'd like to Mr. Kluge then. Thank you. And so we will hear from the government. Thank you, Judge Wilson. Good morning. May it please the court, Jason Wu on behalf of the how it's appropriate for the government to get up on during closing and tell the jury that the judge thought, I guess this was important for you to have it, but it's not the law. I mean, how is that even appropriate? I mean, I've tried cases in front of Judge Cook, and I'm pretty sure she would not have been happy with me if I had said that. I appreciate the question, Your Honor. This was a very unusual case. The fact pattern of this case is not likely to recur again. The reason is that the court gave a very unusual instruction, as Judge Brasher has pointed out, that is always framed in terms of what the defendants contend. And moreover, the judge described it. Mr. Wu, I mean, that's the whole point, is you have a back and forth between the government and the defense counsel. Sometimes you win, sometimes you don't. But once the judge has decided what the jury instructions are going to be, you then have the right to say, look, they presented this jury instruction, but let me tell you why the evidence isn't met. And it doesn't, this jury instruction, they can't show that this jury instruction is valid. That's how you do it. I don't understand how you can get up and say that this is a joke. I understand, Your Honor. And that's why I said this is an unusual case. So let me point you to the parts of the transcript that demonstrate why the government framed it that way. The government framed it that way in large part because that's how Judge Cook described it to the parties during the charge conference. And I believe Judge Brasher alluded to this charge conference. It is an important part of the record here. So at docket entry 809, page 383, Judge Cook, speaking about this instruction, said, quote, I don't want the jury to think this is part of the actual substantive instruction. I want them to She reiterated, quote, remember, counsel, what I keep saying is this is a theory, not a legal instruction, end quote. And the next day, while the charge conference continued over at docket entry 810, page three, she said that she had taken out certain sections of the defendant's proposal, quote, because I thought they went beyond theory of defense and went into the law, end quote. This is important because in analyzing a misconduct claim, you have to determine whether the government acted deliberately to defy the court. Admittedly, we spoke imperfectly. I don't dispute that. We should not have, and we could have said it better and more precisely. But in context, we were not attempting to defy the court. We had heard repeatedly from the court in the charge conference that its view was this is sort of a defendant's theory, what they're contending that we would be allowed. You said it several times, though, and not just once. Correct, because we understood that to be the court's view of the instruction. As soon as the court sustained the objection to it, the government never said that sentiment again. So the government adhered to the court's correction when made. The first time the government made this argument, the defendants objected and the district court overruled the objection and told the government it could basically continue making the argument, right? Correct. And then within a very short span of time, bear in mind this is all within two minutes of two days worth of closing arguments. The defendants objected a second time. It was sustained. The court told the government to move on and the government never repeated the sentiment. I also want to stress, and I think the easiest way to decide this case is on the lack of prejudice, which Judge Wilson alluded to. For the defendants to prevail, they have to show a reasonable probability of a different outcome from these remarks from the government. However, we should. I just I just asked the question, but it seems to me that there that their entire defense, the defendants entire defense was based on the tackle off instruction that the government has to prove more than it intended to see. About the nature of the bargain, it has to prove an intent to harm, and so their entire defense was based on this instruction. And so when the prosecutor tells the jury that disregard the law that the theory of defense is not the law, that seems to be pretty substantial violation of the defendant's rights to me. So I have a few responses to that, Your Honor. In terms of showing that there was no prejudice, the first and most important thing to remember is that the district court gave a curative instruction, a docket entry 811 page 129. This came after the government's rebuttal argument. So the last thing that the jury heard before they started deliberating was that they had to follow the law, even if they disagreed with it, that they had to follow the instructions as a whole, and they could not single out or disregard an instruction, which is me. It sounds to me like Judge Cook sort of felt disrespected by the prosecutor. Her words, you trash the instruction. You told the jury it is a joke. And then later, although she gave a curative instruction, she expressed some reservations or regrets about the viability of the curative instruction. She wished it had been stronger and didn't feel like it was strong enough. I acknowledge that. I will point out in that hearing when she made that so she framed it. This was sort of an off the cuff comment during the post trial motions hearing. So it was not a finding, but I acknowledge she did say that. However, this curative was robust enough that I'll also, of course, this court reviews it to Nova. So this court does not need to defer to Judge Cook's view on the matter. Judge Cook gave the curative instruction and it was laser targeted at the issue that the defendants are raising, which is the fear that the jury would have felt free to pick and choose between different segments of the law or the instructions and to disregard a specific page of the instructions, i.e. their theory of defense. Judge Cook specifically told them you cannot single out or disregard any instruction. And the defendants never asked for a more specific curative than that. They moved for mistrial, but they did not propose different language for her curative instruction. We review. So you just said something interesting. So it was my understanding that we review the ruling on the mistrial for abuse of discretion. Am I wrong about that? That's correct, Your Honor. But this part is a prosecutorial misconduct claim, which this court reviews to Nova. And I think that's significant because it essentially means you look at the record of the trial and the curative instruction and draw your own judgment about whether the prejudice occasioned by the government's argument was so severe as to be incurable by the measures that the district court took. That warrants de novo review. Could we switch gears and talk about the sufficiency of the evidence arguments? Because I do have some concerns about the sufficiency of the evidence. So, you know, reading the talk a lot of case, it seems like some of the lies at issue here are not fraudulent lies. So, for example, false names, things like that. With respect to these defendants, what lies were told as part of this conspiracy that are fraudulent lies under talk a lot as opposed to just lies that you tell? Does that make sense? It does. So I agree with you that lying about your name alone is not a material misrepresentation. And the government made this exact point in its closing. In the rebuttal argument, the prosecutor said something to the effect of false names. Is that why we're here? No. The essence of the fraud is the benefit of the bargain. That's a concept that we stress throughout the closing. So the material lies in this case start with the first one identified in the indictment is no commissions, no fees. That's plainly a material lie because it's a lie about the nature of the transaction that the victim is entering into. And it's a misrepresentation in this case because although these people said no commissions, no fees, whenever asked about it, in fact, 20 percent of the victim's monies went straight into their pockets. Other material lies include the fact that the stock was soon to be listed or pending listing on Nasdaq or Amex, two major stock exchanges, lies about the leadership of the companies, their memberships of the board of directors or their major investors. So multiple defendants particularly topping told investors that John Scully, a former Apple CEO, was involved in the company. At one point, he even told a specific victim that Scully had to personally authorize the sale of shares to that victim, suggesting that Scully was involved in managing the company. And they also looped in other important business figures such as Philip Frost, which was a lie that was told by both Snigrod and Topping, and Papa John's, the founder of Papa John's Pizza. Those were all material misrepresentations made by the defendants. Also, Segarro specifically made additional misrepresentations about an endorsement from Cesar Millan, a television personality, along with clinical trials that she claimed were occurring at Yale Medical School and the Miami Children's Hospital. Okay, so you've appealed for the judgment of acquittal on Wheeler & Long. What evidence do you have with respect to Wheeler & Long specifically? Yes, thank you, Your Honor. I appreciate you asking about that. This court should reverse the Rule 29 acquittals as to Wheeler & Long. And as a setup to this point, I want to stress that we have to ask the right question to get the right answer. I think the defendants insist that they had to know about what they call the quote, unquote, the real fraud scheme, which was what Craig Sizer, the owner of Santa Medix and Funko Free was doing with the money. That's not the fraud alleged in the indictment. If we look at paragraph three of both of the conspiracy counts, counts one and 11, the conspiracy alleged is to misappropriate investor money by misrepresenting the characteristics of these companies, and then reap the profits, the ill-gotten gains through concealed commissions. So what these people actually needed to know to be guilty of the fraud scheme alleged was that they were telling material lies to these investors about the companies and that they were getting commissions. So Wheeler & Long knew that just as well as all of the other defendants. Wheeler made the no commissions, no fees misrepresentation as to both Santa Medix and Funko Free. That's at docket entry 802, page 278, and docket entry 443, page 205. Similarly, Long, who's only charged in the Funko Free conspiracy, made the same no commissions and no fees misrepresentation. That's also at docket entry 434, page 205. That was testimony from cooperating witnesses who heard them make that misrepresentation to multiple investors. What's significant about that is that's the kind of misrepresentation that no one could reasonably believe or be ignorant of its falsity. They knew they were being paid in commissions because they had to fill out their own commission sheets to claim their share of the profits. So every time they sold an investor and that investor's check came in, they filled out a piece of paper that listed the investor's amount of investment and their share, which was typically 15 to 20% of the total amount. Furthermore, as to Wheeler, he made the misrepresentation that Funko Free had millions in profits. That's at docket entry 802, page 39. And Long, at the same page, the witness also recalled Long making that misrepresentation. That's significant because the written materials that the salespeople had about the Funko Free Corporation specifically say that the company had garnered $300,000 in revenue. So compare those alone. And those written materials are government's exhibit four are specifically page four. This court in the McCrimmon case and the Simon case pointed out that salespeople who make false representations that go beyond their written source material are proved, you know, there's sufficient evidence of fraud as to those salespeople. Even more specifically, go ahead. We'll take a look at the, we'll take a look at the transcript. But I'd like to turn to another issue that the defendants raised on appeal. And it concerns the cross examination of Gary Miller. And the government was able to get into evidence in this case. Evidence that Miller or Ms. Segaro sold drugs. How is that, how does that meet the test for relevancy? The fact that Segaro sold drugs with Gary Miller, that seems to me to be completely improper that the government was able to, I hate to use the word, sneak that in during their cross examination of Gary Miller. Didn't have anything to do with the evidence, with the facts. In this case, it was impeachment against Gary Miller, Your Honor. And the reason was that Gary Miller testified on behalf of Segaro. So the government was entitled to ask whether they had any relationships that would influence or slant his testimony. The fact that they had a different, potentially different criminal enterprise together leads to an obvious inference of bias, because that means Segaro has, you know, colloquially we would say blackmail material on Miller. She and Miller engaged in a different business, and it would give her a pressure point to induce him to give favorable testimony to her in this case. Therefore, we were entitled to ask the initial question. Now, once he denied it under Rule 6, Turn 13B, we were at a minimum entitled to bring in extrinsic evidence just to show he made a prior inconsistent statement. And I do want to stress that, Your Honor, because we actually did not get any substantive evidence that Segaro committed any drug offense. The district court gave a limiting instruction, the docket entry 809, page 85 to 86, that clearly said the testimony is not offered to prove the truth of the statement. It is offered only to assist you in determining the credibility of this witness. But the jury had no evidence. Mr. Wu, this case seems very similar to a prior case that was decided in the 11th Circuit, United States v. Reed. And in Reed, we reversed a conviction because irrelevant references to the defendant's drug use amounted to prejudicial error. I'm not sure how this case is that much different than United States v. Reed. Without the prior inconsistent statement, the drug dealing was just collateral, that had anything to do with the case. Respectfully, I disagree, Your Honor, and I do explain that in a footnote to my brief. So I agree, if you ask this question directly at the defendant, it doesn't bear on a relevant fact. But when you ask it of one of the defendant's witnesses who has a connection or relationship to the defendant, it becomes relevant. But why do you have to ask that question? If I could just ask the question, Mr. Wu, do you have a business relationship with Mr. Solomon? The answer is yes or no. And why do you then have to delve into a relationship as to what is the nature of the business relationship? You wanted to delve into it because it was a criminal enterprise, because I'm sure if it was, you know, an ownership in a sub, it would not be something that interested you. Respectfully, Your Honor, it has much more impact, not improper impact. It has impact because the nature of the relationship and its illegality gives Miller greater reason to lie on Segarra's behalf. Like you just said, if you asked me, do I have a business relationship? That sounds extremely innocuous. However, if you asked me, did I commit murder with the defendant? And the answer to that truthfully is yes. Then that explains why I'm coming in to testify for him, because he has blackmail material on me. So that's the inference that we were seeking the jury to draw initially, which was that Miller and Segarra engaged in another legal enterprise. And that's why he's coming in and testifying for her. She's holding something over his head. That was an argument. Would it have been proper if the question on cross-examination was, did you ever sell drugs with Segarra period? Would that have been improper? I mean, that that would obviously be for the purpose of telling the jury that Segarra sold drugs, right? And not for any other purpose. It would not be for the purpose of showing bias to impeach the credibility of the witness by demonstrating bias. If that was the question alone, would that have been improper and subject to a reversible error? I believe it arguably would be proper with a limiting instruction. So I agree, it should not have been considered solely as to the fact that she committed other legal conduct, but if the court limited... Would that have been a proper question on cross-examination sufficient to withstand rules 403 and 404? Yes, if limited, because then the government could follow up with, so did she ever threaten you with that information to induce you to testify? That's the inference that we would be seeking to draw, is that the fact that they have pre-existing illegal relationships encourage this witness to come in and testify on her behalf. I appreciate that. Well, thank you so much for your time, Your Honors. If there are no further questions, we urge this court to uphold the jury's verdicts in all respect, including restoring the convictions of Wheeler and Long. Thank you, Mr. Wu. Mr. Clue, you've reserved some time for rebuttal. Thank you, Your Honor. I think it's why some of the other issues regarding the excesses by the government are relevant, is because the government says that the indictment didn't charge the conspiracy that the district court thought it charged. The government says it didn't charge the fraud scheme the district court thought it, and when the indictment charged the misappropriation of investor money, it did charge what the district court said, but that is important that the district judge was not somewhere imagining what the case was about. The district court was right on point. The government was all over the map, and they were throwing in anything possible, anything possible to get the conspiracy of these salesmen when there was no evidence that they had any knowledge of the misappropriation of the investor money. That's what her instruction was about. It was in part tackle-off based because it focused on intent to defraud rather than mere deceit, because as you can see, Begirls and Tackle-Off got a 20% commission. Toppings, according to the government, gets a 10% commission, even though the evidence shows he at times got 20% himself. That's what she was doing. She was saying, look, don't bring in a Begirls conspiracy into an investor misappropriation case. That's what that instruction was about. She wasn't just buying all in on Tackle-Off and saying, I'm just going on Tackle-Off. It was, don't deviate. Don't be all over the map with the case, and that's what the government tried to do over and over and over again. They violated district court orders. We have a lengthy, lengthy footnote in our initial briefing that explains that, and I urge the court to consider the entirety of the record of what the government did to try to exceed their charge case. Thank you, Mr. Kluge. Mr. Sagan. Yes, again, on behalf of Anita Sciro, the situation with this Gary Miller, where the government was allowed to ask Mr. Miller about something to do with selling drugs with Anita Sciro, and then later they even went on to tell the jury to ask Mr. Miller, didn't you also continue to sell drugs separately from that, was just designed to badmouth and make Anita Sciro look bad to the jury. Had nothing to do with proper impeachment. It was a complete collateral matter, and when he said no, that should have been the end of it. But nevertheless, the government talked about it over and over. They talked about it in closing argument, and they made it somewhat of a feature with respect to Mr. Miller. There was no reason for that, and it was improper impeachment. I also want to point out that the error with the jury instruction and the other errors of this case, when you look at whether it's harmless error, and you've asked about this, this jury could very easily have found that the defendant's deceitful statements were made to induce investors to purchase stock, not to harm the investors. And because that jury instruction was, they were told to not pay attention to it, it wasn't the law, severely prejudiced Anita Sciro in a case which does not have overwhelming evidence. And as you look at it very carefully, telling the lies that she did was not the same as trying to defraud the investors. She thought it was a good thermometer. Other people thought it was a good thermometer, and it would have probably worked, but for the stealing by in this case. Thank you, Mr. Sagan. Mr. Solomon. Yes, with regard to the, my portion of this is Appley. I would like to start by reading very quickly what Judge Cook, who presided over a two and a half month trial, and who reserved ruling on a rule 29 motion for judgment of acquittal, said about my client in her order of dismissal. She said, there is no question that long misrepresented to investors, which is true, which is a question that was asked by this court. These deceptions alone are not indicative of an attempt to engage in this scheme. There is insufficient evidence that these deceptions indicated, there is insufficient evidence that these deceptions indicated knowledge of the overarching scheme. Long used his own name. Shawna Lynch doesn't mention long even being on the stand for days. Juan Perez Otega testified that he didn't know if long used the stock restriction technique or what he even said to his clients. There is no proof that, not unlike Isis Machado, that long knew the statements given him in the press releases or the employee meetings were lies and part of a scheme to defraud. So this is what Judge Cook found. Judge Cook based her decision on the law that I've briefed extensively in my brief, citing Toller, Chandler, and Pearlstein. Now Chandler is an 11th Circuit case that relies very heavily on Pearlstein. I do not have the time to go through this, but if you compare the Pearlstein facts to the facts of the case as to Mr. Long, it's highly apropos and shows the same issues with regard to long that the court found in Pearlstein, and that is why Judge Cook granted the motion for judgment of acquittal, and I would respectfully request that the court affirm those that judgment of acquittal. Thank you very much. Thank you, Mr Solomon, and we'll hear from Mr White on behalf of Wheeler. You're muted, Mr White. There were two aggrieved investors who testified that they had been convinced to buy Santa Medix and a Funcool free stock. There was Mark Bradshaw. Mark Bradshaw had no recollection of asking or hearing from Mr Wheeler about whether he was getting the commission or whether he was a I didn't have any concern, and that's at docket entry 458 page 195. Bruce Molina, who was an accredited investor who received the information that Mr Wheeler presented to him and verified it in his own sophisticated investor way, he didn't bring it up at all. He just assumed that Mr Wheeler was a salaried employee. It wasn't an issue, and what did Judge Cook have to say about that? He said there was insufficient evidence that defendants Wheeler and Long knew about the scheme to defraud or agreed to participate in the scheme's objective. Yes, they were paid commission, but there was no evidence of any other financial gain other than their own salaries or commission, and then she goes into the tackle off language and also what Mr Solomon quoted. The point being that Judge Cook believed that people have to assume that you're going to get paid when you're doing a job, and the fact that in Mr Wheeler's case, the fact that he may have received a commission was not a factor in the witnesses that testified against him, and it wasn't a factor in whether he was joining the scheme to defraud. Again, the overriding scheme to defraud was the fact that Sizer, Mason, Houlihan were taking this money and using it for themselves instead of using it to support the companies that they were supposed to support. So Mr Wheeler was being defrauded as much as anybody else, and he was a tool for their scheme. Not a defendant. Thank you, Mr White. That completes the arguments in this case. Thank you, counsel. Thank you. Thank you. Thank you, everyone. Thanks.